UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:12-CR-88-1H(2)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **I N D I C T M E N T** |
| | ) | (SECOND SUPERSEDING) |
| STEPHEN A. LaROQUE | ) | |

The Grand Jury charges that:

### INTRODUCTION

I. **Stephen A. LaRoque's 17-Year History of Running Federally-Funded Non-Profit Corporations.**

1.    Defendant, STEPHEN A. LaROQUE ("LaRoque"), graduated from East Carolina University ("ECU") in 1985, with a degree in Business Administration.  From 1986 through 1992, LaRoque worked in various managerial positions at NationsBank of North Carolina.   In 1992, LaRoque left NationsBank to attend graduate school at ECU, where he obtained a Masters of Business Administration in 1993.   In January of 1995, LaRoque was hired as a loan officer by the Neuse River Council of Governments ("NR-COG"), in New Bern, North Carolina.

2.    NR-COG is a non-profit entity which provides loans funded primarily with federal funds, including funds provided by the United States Department of Agriculture ("USDA") under the Rural Development Division's Intermediary Relending Program ("IRP") and Rural Business Enterprise Grant  ("RBEG") program.  LaRoque was hired by NR-COG at a starting salary of $33,000.

3.     On August 5, 1997, LaRoque, while still employed as a loan administer at NR-COG, submitted an application to the USDA in the name of an entity named East Carolina Development Company, Inc. ("ECDC"), requesting a $2,000,000 loan under the USDA's IRP program ("IRP Loan One").[1]  From August 1997, through to the present, ECDC received ten IRP loans and four RBEG grants from the USDA.[2]

4.     Although LaRoque initially operated ECDC on a volunteer basis, in late 1998, LaRoque left his position at NR-COG and became a paid contractor of ECDC.  At the time he left NR-COG, LaRoque was being paid an annual salary of approximately $46,987, to, in his own words, "successfully administer[] . . . a current loan portfolio of 91 loans totaling $14.6 million."[3]  As shown in the following table, during LaRoque's tenure at ECDC, he received compensation significantly higher[4] than what he was paid at NR-COG

---

[1]LaRoque signed the application as Executive Director of ECDC and listed his home address as ECDC's corporate office.

[2]Each IRP loan to ECDC is amortized over 30 years with a fixed rate of one percent interest per annum.  In addition, the terms of each loan agreement allowed ECDC to pay only interest during the first three years of each loan.  ECDC was not charged interest for the receipt of the RBEG grants.

[3]At ECDC's January 27, 2012, Board meeting, LaRoque presented a revised ECDC Work Plan which changed the description of his work at NR-COG to the following: "successfully administered a loan portfolio composed of 99 loans totaling $15.6 million."

[4]During its 2008-2009 fiscal year, ECDC paid LaRoque $317,800 in compensation, a 676 percent increase from LaRoque's NR-COG salary.  During this same period, LaRoque administered a loan portfolio of $2.4 million, as opposed to the $14.6-15.6 million portfolio he administered at NR-COG.

2

for administering a loan portfolio that never exceeded \$4.3 million:[5]

| Fiscal Year 10/1 - 9/30 | Compensation to LaRoque[6] | Reimbursements to LaRoque | ECDC's Year End Loan Portfolio[7] |
|---|---|---|---|
| 1998-99 | \$    18,000 | \$    11,300.26 | \$1,197,344 |
| 1999-00 | 53,575 | 5,690.01 | 1,255,595 |
| 2000-01 | 70,395 | 10,677.79 | 1,646,404 |
| 2001-02 | 100,275 | 6,898.40 | 2,778,567 |
| 2002-03 | 124,750 | 7,389.77 | 3,265,431 |
| 2003-04 | 109,300 | 8,338.70 | 3,806,158 |
| 2004-05 | 187,800 | 5,923.76 | 4,148,066 |
| 2005-06 | 107,700 | 5,175.19 | 3,130,122 |
| 2006-07 | 195,000 | 7,980.24 | 2,904,701 |
| 2007-08 | 135,000 | 11,303.64 | 2,358,792 |
| 2008-09 | 317,800 | 19,761.47 | 2,397,893 |
| 2009-10 | 291,225 | 16,478.67 | 2,355,699 |
| 2010-11 | 122,250 | 13,283.83 | 2,338,028 |
| 2011-12 | 134,219.38 | 3,390.12 | N/A |
| Totals | \$1,967,289.38 | \$    133,591.85 | |

---

[5]ECDC's largest loan portfolio was approximately \$4,304,190.33, on or about May 31, 2005.

[6]Although LaRoque made some of his compensation checks payable to an entity named LaRoque Management Group, ECDC's tax returns and Board minutes consistently reported management compensation as being paid solely to LaRoque in his individual capacity as Executive Director. Furthermore, ECDC never entered into a management contract with LaRoque Management Group.

[7]ECDC's 1998-2010 loan portfolios are taken from the "notes receivable" asset disclosed on ECDC's audited financial statements. The loan portfolio for 2010-11 is taken from ECDC's monthly financial records.

3

## II. LaRoque's Success in Obtaining Federal Funding for ECDC from 1999 through Late 2003.

5.    As noted above, LaRoque filed ECDC's application for its first IRP loan in August of 1997, before even incorporating ECDC. In the 15 years following ECDC's initial application, LaRoque became very adept in obtaining federal funding for ECDC,[8] often during times when ECDC was not in need of federal funding.    The following chart reflects the amount of funds that ECDC had on hand when it applied for federal funding through the IRP program:

| Loan No. | Date (On or about) | IRP Funds Requested[9] | Funds on Hand[10] |
|------|--------------------|------------------------|-------------------|
| 1. | August 5, 1997 | $2,000,000 | None |
| 2. | August 31, 1998 | 1,000,000 | $    104,912 |
| 3. | September 15, 1999 | 1,000,000 | 240,456 |
| 4. | March 28, 2001 | 750,000 | 907,495 |
| 5. | March 18, 2002 | 750,000 | 479,504 |
| 6. | December 11, 2002 | 750,000 | 562,803 |
| 7. | February 25, 2004 | 750,000 | 391,155 |

---

[8]As discussed below, LaRoque created a second non-profit named Piedmont Development Corporation in 2003, for which he was able to obtain both an IRP loan and an RBEG grant.  In addition to ECDC's ten IRP loans, LaRoque was also able to obtain four RBEG grants for ECDC in the aggregate sum of $329,800.

[9]With regard to IRP Loans One, Three, and Five, the USDA only agreed to loan ECDC a portion of the requested amount.

[10]The funds on hand listed in connection IRP Loans Two through Five are taken from the aggregate deposit account balances shown on ECDC's audited financial statement for the close of the fiscal year in which the request was made.  The funds on hand listed in connection with IRP Loans Six through Ten are taken from the aggregate deposit account balances shown on ECDC's monthly financial records.

4

| 8. | December 23, 2004 | 750,000 | 1,101,446 |
| 9. | December 15, 2005 | 750,000 | 1,478,787 |
| 10. | February 13, 2009 | 750,000 | 3,416,103 |

6.    The intent behind the USDA's funding of non-profit entities like ECDC is described as follows in the USDA Website:

> The purpose of the IRP program is to alleviate poverty and increase economic activity and employment in rural communities. Under the IRP program, loans are provided to local organizations (intermediaries) for the establishment of revolving loan funds.

Under the IRP program, a recipient, referred to as an "Intermediary," is granted a federally-funded, low interest loan and allowed to re-loan the money to persons and businesses in rural communities at whatever interest rates can be negotiated.[11]

7.    Once an IRP loan is closed, the loan proceeds are required to remain with the USDA until the Intermediary's board and the USDA approve the loan to the ultimate recipient. Once approved, the USDA disburses the IRP loan proceeds to the Intermediary's bank account. The Intermediary then disburses the proceeds to the ultimate recipient. Due to this procedure, it often took ECDC several months to receive all the proceeds of an IRP loan. Of the $6,717,980 in approved USDA IRP loans that

---

[11]According to USDA Regulations, "[f]inancial assistance from the intermediary to the ultimate recipient must be for business facilities and community development projects in rural areas." 7 C.F.R. § 1951.853(b)(1). The Regulations further state that rural area includes "[a]ll territory of a State that is not within the outer boundary of any city having a population of 25,000 or more . . . ." 7 C.F.R. § 4274.302(a).

5

LaRoque was able to obtain for ECDC, ECDC received disbursement of $6,134,480.[12] As of December 6, 2012, $4,745,786.08 in unpaid principal was owed to the USDA in connection with ECDC's ten IRP loans.

8. Under the IRP program, the principal and interest repaid to the Intermediary by ultimate borrowers are required to be segregated into a bank account often called an "IRP revolving fund" and only used to fund additional loans to small rural businesses and to pay reasonable administrative costs.

9. In order to ensure that excess administrative costs are not paid with revolved funds, the USDA Regulations impose the following duty on the Intermediary:

> The intermediary must submit an annual budget of proposed administrative costs for Agency approval. The amount removed from the IRP revolving fund for administrative costs in any year must be reasonable, must not exceed the actual cost of operating the IRP revolving fund, including loan servicing and providing technical assistance, and must not exceed the amount approved by the Agency [USDA] in the intermediary's annual budget.

7 C.F.R. § 4274.332(b)(2). The USDA Regulations also require that an Intermediary receiving an IRP loan furnish the USDA with periodic financial reports, an annual proposed budget for the following year, an annual financial audit of activities, and "a summary of names and characteristics of the ultimate recipients the

---

[12]To date, ECDC has only drawn $166,500 on its last authorized IRP loan.

intermediary has financed." 7 C.F.R. §§ 1951.883(a) and 4274.338(b).

10. On August 20, 1997, following the submission of ECDC's application for IRP Loan One, LaRoque filed Articles of Incorporation with the North Carolina Secretary of State creating ECDC as a non-profit corporation pursuant North Carolina General Statute Section 55A ("N.C. Nonprofit Corporation Act"). LaRoque listed himself as both the registered agent and sole incorporator of ECDC and listed ECDC's registered office as his home address.

11. On October 7, 1997, LaRoque, as Executive Director, held the first meeting of ECDC's Board of Directors ("ECDC Board") at the Kinston Country Club, in Kinston, North Carolina. The minutes from the meeting reflect the presence of four directors and LaRoque, who is identified as "Staff." During the meeting, the Board elected officers and adopted Bylaws ("ECDC Bylaws").

12. The ECDC Bylaws include the following provisions: (a) a listing of a ten county development area ("ECDC Development Area") to be served by ECDC (see ECDC Bylaws Art. II, Sec. 2); (b) a prohibition against any member[13] of ECDC "own[ing] any financial interest in any project receiving assistance from . . ." ECDC (see ECDC Bylaws Art. II, Sec. 3); (c) a prohibition against any member

---

[13]On April 2, 1998, the Bylaws were amended to replace references to the word "member" with the word "director." In addition, some technical changes were made in order to allow ECDC to be eligible for tax exempt status under North Carolina law.

Case 4:12-cr-00088-H   Document 32   Filed 04/17/13   Page 7 of 77

of ECDC's Board being "an officer, director or owner of any business receiving direct assistance from . . ." ECDC (see ECDC Bylaws Art. III, Sec. 5); (d) a requirement that "forty percent of Directors then in office shall be necessary to constitute of [sic] quorum of the transaction of business; provided, however, that in no event shall a quorum be less then four (4) directors. . ." (see ECDC Bylaws Art. IV, Sec. 5); (e) a requirement that each director be provided with three days written notice prior to any Board meeting (see ECDC Bylaws Art. V, Sec. 3); and (f) a provision stating that any Director that misses "three consecutive meetings or 50% of meetings held during the year will be considered as having resigned" (see ECDC Bylaws Art. II, Sec. 9). According to USDA Regulations, each Intermediary receiving an IRP loan is prohibited from making "any changes in the intermediary's . . . by-laws without the concurrence of the Agency [USDA]." 7 C.F.R. § 4274.338(b)(1).

13. In addition to providing the USDA with copies of ECDC's organizational documents (including ECDC's Bylaws), LaRoque was also required to provide the USDA with a Work Plan ("ECDC Work Plan") setting forth ECDC's operational policies and procedures. The ECDC Work Plan requires that a majority of the Board members must vote in favor of each loan in order for approval. In addition, the ECDC Work Plan represents that ECDC will only make loans to borrowers from cities having a population of less than 25,000, will

8

not make a loan to a borrower who could otherwise obtain the loan from a private lender, and will limit the total amount of loans made to any ultimate recipient to $150,000. According to USDA Regulations, each Intermediary receiving an IRP loan is obligated "[t]o obtain written approval of the Agency [USDA] before making any significant changes in . . . the work plan." 7 C.F.R. § 4274.338(b)(6).

14. In the portion of the ECDC Work Plan entitled "Ineligible Use of Proceeds - Intermediary," ECDC represents that it will not make loans for the purpose of assisting "principals, directors, officers and employees of ECDC and its affiliate organizations. Conflict of interest or the appearance of conflict of interest must be avoided."

15. On November 17, 1997, while its IRP Loan One application was still pending with the USDA, ECDC submitted an application to the USDA for an RBEG grant of $120,000 ("RBEG Grant One"). The RBEG program, which, like the IRP program, is administered by the USDA, provides grants to public bodies and private non-profit corporations for use in financing small and emerging rural businesses. Unlike funds received under the IRP program, RBEG funds are given to the Intermediary at no cost. The Intermediary lender is allowed to negotiate a rate of interest to charge the ultimate recipient, but, as is the case with IRP funds, can only use the principal and interest payments from such borrowers to fund

9

additional loans to small rural businesses and to pay reasonable operational costs.

16. On April 2, 1998, ECDC held a Board meeting at the Kinston Country Club during which it was announced that the USDA had approved the IRP Loan One in the amount of $500,000 and the RBEG Grant One in the amount of $90,000. The USDA Regulations governing the servicing and collection of loans funded by IRP loans and RBEG grants are contained in 7 C.F.R. Section 1951. In a Section entitled "Conflict of Interest," the regulations state as follows:

> The intermediary will, for each proposed loan to an ultimate recipient, inform Rural Development in writing and furnish such additional evidence as Rural Development requests as to whether and the extent to which the intermediary or its principal officers (including immediate family) hold any legal or financial interest or influence in the ultimate recipient or the ultimate recipient or any of its principal officers (including immediate family) holds any legal or financial interest or influence in the intermediary. Rural Development shall determine whether such ownership, influence or financial interest is sufficient to create a potential conflict of interest. In the event Rural Development determines there is a conflict of interest, the intermediary's assistance to the ultimate recipient will not be approved until such conflict is eliminated.

7 C.F.R. § 1951.867.

17. During ECDC's April 2, 1998, Board meeting, LaRoque, as Executive Director, presented a three-year projected budget which included no compensation for staff during ECDC's first three years

10

of existence. The Board authorized reimbursement to LaRoque for expenses that he had incurred on behalf of ECDC. The Board also authorized LaRoque to make three loans using the USDA funds. All of the proceeds of the IRP Loan One and the RBEG Grant One were fully disbursed to ECDC and lent to ultimate recipients by the end of June 1998.

18. In mid-1998, ECDC sought an Internal Revenue Service ("IRS") ruling that it was tax exempt for federal tax purposes. In mid-May 1998, the IRS sent correspondence to ECDC requesting information required prior to a ruling on ECDC's request for tax exempt status. Included in the IRS's inquiry was the following question pertaining to conflict procedures that ECDC would use in determining compensation to ECDC's governing body:

> Will members of the governing body make decisions about compensation of employees and other parties providing services to the organization? If so, fully explain how officers and directors who are also employees of the organization salaries will be determined. . . . Provide a statement signed by all your officers and directors under penalty of perjury that officers and directors that are also employees will not take part in determining and voting on the salaries they or others will receive.

In response to this question, ECDC responded that "no officers receive compensation." ECDC also informed the IRS that "[n]o members of the [ECDC's] governing body receive payments from the organization either directly or indirectly through financial interests in organizations with which we do business."

11

19. By letter dated June 25, 1998, ECDC was granted tax exempt status under Section 501(c)(3) of the Internal Revenue Code. The letter noted that as a tax exempt organization, ECDC was required to file a Form 990 Return of Organization Exempt from Income Tax ("Form 990") on the 15th day of the fifth month after the end of ECDC annual accounting period.[14] The IRS also informed ECDC that it should provide notice to the IRS if it changed its "purposes, character, or method of operation" and that ECDC should provide the IRS with any amendment to ECDC's Bylaws.

20. On August 31, 1998, ECDC filed an application with the USDA for a $1,000,000 IRP Loan ("IRP Loan Two"). In support of its application, ECDC represented that it had budgeted $35,000 to be paid to its Executive Director for the 1998-1999 tax year. Prior to the loan closing, LaRoque provided the USDA with ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to him. ECDC also represented that it does not loan to "any concern in which an officer, director . . . or proprietor . . ." of ECDC has a "substantial interest." Included with the loan application were copies of ECDC's Bylaws and a certification that ECDC "will operate in accordance with the Work Plan previously submitted in IRP loan application dated August, 1997."

---

[14]Because ECDC's operates on a fiscal year running from October 1st through the following September 30th, it's Form 990 is due on the February 15th following the end of each fiscal tax year.

12

21.   On November 20, 1998, the ECDC Board had a meeting at the Kinston Country Club.  LaRoque, who was still employed by NR-COG, attended the meeting as unpaid staff.  During the meeting, the ECDC Board voted to amend its Bylaws to include term limits for its Directors.  LaRoque also presented the Board with a proposed 1998-99 budget which included an allocation of $18,000 for "Contracted Services - Executive Director."[15]   The Board approved the budget noting that "[e]xpenses include payments to the Executive Director in the event he terminates his current employment with the Neuse River Council of Governments."

22.   LaRoque left his position at NR-COG in the fall of 1998. On February 16, 1999, the ECDC Board had a meeting at the Kinston Country Club, during which the Board approved a contract hiring LaRoque as an independent contractor to operate ECDC in exchange for $18,000 per year.   The contract, which obligated ECDC to provide LaRoque with pay for the work he performed as a volunteer from October 1998, through to his hiring date, also provided that LaRoque would be "reimbursed for all expenses directly related to particular projects.   These expenses shall be pre-approved by ECDC."

23.   On April 30, 1999, the USDA approved the IRP Loan Two in the amount of $1,000,000.  All of the proceeds of the IRP Loan Two

---

[15]There is no mention in the minutes as to why the amount budgeted to be paid to LaRoque is less than the amount reflected in the IRP Loan One application.

were fully disbursed to ECDC and lent to ultimate recipients by late November 1999. In accordance with ECDC's Work Plan, each loan made by ECDC in connection with IRP Loan Two was preapproved by ECDC's Board.

24. On August 24, 1999, the ECDC Board met at the Kinston Country Club. According to the Board meeting minutes:

> Mr. LaRoque reminded the Board that his contract for services expires on September 30, 1999. The Board authorized . . . [the "Senior Board Member"] to pursue a new contract with Mr. LaRoque after consultation with other Directors.

The Senior Board Member recalls meeting with LaRoque and discussing the concept of a percentage-based compensation agreement. The Senior Board Member noted that he and LaRoque discussed the need to revisit the terms of any compensation agreement if ECDC assets grew too high in order to avoid excessive compensation. It also appears that the Senior Board Member agreed that LaRoque would be entitled to reimbursement for loan-related expenses pre-approved by ECDC's Board.

25. On September 15, 1999, ECDC filed an application with the USDA for another $1,000,000 IRP Loan ("IRP Loan Three"). Included in support of the loan application were copies of ECDC's Bylaws and a certification that ECDC would "operate in accordance with the Work Plan previously submitted in IRP loan application dated August, 1997." In support of its application, ECDC represented that it had budgeted $48,000 to be paid to its Executive Director

14

for the 1999-2000 tax year. Prior to the loan closing, LaRoque provided the USDA with ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to him. ECDC also represented that it does not loan to "any concern in which an officer, director . . . or proprietor . . ." of ECDC has a "substantial interest."

26. On November 8, 1999, ECDC submitted an application with the USDA seeking a second RBEG grant in the sum of $99,900 ("RBEG Grant Two").

27. The terms of LaRoque's compensation contract were never directly approved by the Board and a signed copy of the contract does not exist. However, an unsigned copy of a document purporting to be a September 1999 management contract between LaRoque and ECDC provides LaRoque with annual compensation of three percent of "total program assets being administered," which is estimated in the unsigned contract to be $48,000 per year.

28. On November 16, 1999, the ECDC Board met at the Kinston Country Club and approved a budget for the fiscal year 1999-2000 which included an increase in the contract payment to LaRoque from $18,000 to $48,000. At this meeting, the Board followed LaRoque's proposal and added his brother ("LaRoque's brother") as a Director.

29. On May 2, 2000, the ECDC Board had a meeting at the Kinston Country Club during which LaRoque informed the Board that the IRP Loan Three, in the sum of $500,000, had been closed and

15

that the RBEG Grant Two, in the sum of $99,900 had been approved by the USDA. The proceeds from the IRP Loan Three were fully disbursed by the USDA to ECDC by March 2001. The proceeds of RBEG Grant Two were fully disbursed to ECDC by December 2001.

30.     On March 22, 2001, the Board held a Director's meeting at the Kinston Country Club that was attended by four Directors (including LaRoque's brother) and by LaRoque as ECDC's staff. During the meeting, the Board approved an amendment to ECDC's Bylaws which made the following changes: (a) changed the quorum requirement for Board meetings from "in no event shall a quorum be less than four (4) Directors," to "in no event shall a quorum be less than four (3) [sic] Directors" (ECDC Bylaws Art. IV, Sec. 5); (b) changed the officers of ECDC from "President, Vice President, Secretary/Treasurer" to "Chairman, Vice Chairman, President, Secretary/Treasury" (ECDC Bylaws Art. V, Sec. 1); (c) excluded the office of President from term limitations (ECDC Bylaws Art. V, Sec. 1); and (d) changed the name of the staff position from "Executive Vice President" (ECDC Bylaws Art. V, Sec. 9) to "Executive Director" (ECDC Bylaws Art. V, Sec. 9). Although not contained in the revised ECDC Bylaws, the minutes of the Board meeting state that "the Executive Director shall serve as the President of the corporation and a Director . . . ." There is not any discussion reflected in the ECDC Board minutes regarding the apparent attempt to change the quorum requirement.

16

31. At this same Board meeting, ECDC approved a budget authorizing payment to LaRoque during the 2000-2001 fiscal year of $70,000. The Board also approved a loan of $150,000 to Susan's Carpet and Interiors, Inc., d/b/a The Flooring Gallery ("Susan's Carpet"), which was owned by the woman who LaRoque would marry on July 7, 2007 ("Susan's Carpet Owner"). According to ECDC's audited financial statements, during the period from its inception through September 30, 2001, ECDC made approximately 19 loans. Eighteen of the loans charged interest at annual rates of between 8 and 9.5 percent. The loan to Susan's Carpet charged interest at an annual rate of 4.3 interest.

32. On or about March 28, 2001, ECDC submitted an application for a fourth IRP loan ("IRP Loan Four") in the amount of $750,000. In the application, ECDC represented that LaRoque served as Executive Director and was budgeted to receive $60,000 from ECDC during the fiscal year ending September 30, 2001. Prior to the loan closing, LaRoque provided the USDA with ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to him. ECDC also represented that it does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [ECDC] has a substantial interest" and that ECDC would continue to operate in accordance with the original ECDC Work Plan.

17

33. On May 7, 2001, Susan's Carpet installed carpet in LaRoque's home, a portion of which was being used by LaRoque to operate his sole-proprietorship (LaRoque Management Group) and ECDC. The invoice for the work, in the sum of $414.63, was paid by ECDC.

34. On June 7, 2001, LaRoque was informed, by letter, that the USDA had agreed to make the $750,000 IRP Loan Four to ECDC. The proceeds under this loan were fully disbursed to ECDC by May 2002.

35. During the fall of 2001, LaRoque started making a number of loans to ultimate recipients without obtaining prior ECDC Board approval as required under ECDC's Bylaws and Work Plan.

36. On December 12, 2001, Susan's Carpet made a payment of $150,000 in full payment of its ECDC loan. On January 9, 2002, the ECDC Board met at the Kinston Country Club and granted LaRoque's motion to add the Susan's Carpet Owner to ECDC's Board. The Board then confirmed some loans that LaRoque had made without prior Board approval. The Board also approved a budget for ECDC 2001-2002 fiscal year which increased LaRoque's compensation to $95,000.

37. On or about March 18, 2002, LaRoque filed an application for a fifth IRP loan ("IRP Loan Five") in the amount of $750,000. In the application for IRP Loan Five, LaRoque represented that he served as Executive Director and was budgeted to receive $95,000 from ECDC during the fiscal year ending September 30, 2002. Prior

18

to the loan closing, LaRoque provided the USDA with ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to him. LaRoque also represented that ECDC would continue to operate in accordance with the original ECDC Work Plan and that ECDC does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [ECDC] has a substantial interest."

38. On May 24, 2002, the ECDC Board had a meeting at the Kinston Country Club. During this meeting, the Board granted LaRoque's request to confirm a number of loans that he had made without prior Board approval.

39. In July 2002, a Statement of Organization was filed with the North Carolina State Board of Elections creating "Stephen LaRoque for NC House." LaRoque then appointed the Susan's Carpet Owner as treasurer of Stephen LaRoque for NC House ("LaRoque Campaign Committee").

40. On September 20, 2002, LaRoque faxed a letter to the USDA stating that he had become aware that the USDA would likely be limiting IRP Loan Five to $217,000, rather than the requested $750,000. LaRoque informed the USDA that ECDC would be "willing to accept these funds with the understanding that it can apply for subsequent loan funds in the next fiscal year (beginning October 1, 2002)." At the time of LaRoque's telefax, ECDC had funds available in the sum of approximately $479,504. On September 30, 2002, the

19

USDA approved IRP Loan Five in the sum of $217,980. The loan proceeds for this loan were fully disbursed by December 2002.

41. On October 30, 2002, LaRoque filed an application for a third RBEG loan in the amount of $99,900 ("RBEG Grant Three").

42. On November 5, 2002, LaRoque was elected to the North Carolina House of Representative for North Carolina's Tenth District.

43. On December 12, 2002, LaRoque filed an application with the USDA for a sixth IRP loan in the amount of $750,000 ("IRP Loan Six"). In response to question 12 of the application, LaRoque listed himself as President of ECDC, but left the box for "Annual Compensation" empty. Prior to closing the loan, LaRoque provided the USDA with copies of ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to LaRoque. LaRoque also represented that ECDC would continue to operate in accordance with the original ECDC Work Plan and that ECDC does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [ECDC] has a substantial interest."

44. On April 28, 2003, the ECDC Board had a meeting at the Kinston Country Club. During this meeting, the Board approved a budget for ECDC 2002-2003 fiscal year which increased LaRoque's compensation to $125,000.

20

45. On May 12, 2003, the USDA approved RBEG Grant Three to ECDC in the sum of $99,900. This amount was disbursed to ECDC in June 2003.

46. On August 26, 2003, ECDC IRP Loan Six, in the amount of $750,000, was formally approved by the USDA. The proceeds from this loan were disbursed during the period from September 2003, through May 2004.

### III. LaRoque's Operation of ECDC and Piedmont Development Corporation from late 2003, through December 2005.

47. In the fall of 2003, LaRoque created a non-profit entity named Piedmont Development Company, Inc. ("PDC") which was based on ECDC's organizational structure, but intended to operate in eleven western North Carolina counties ("PDC Development Area"). On September 30, 2003, LaRoque held the first meeting of the Board of Directors of PDC. The directors at the first meeting consisted of LaRoque, the ECDC director who was co-signatory with LaRoque on most ECDC checks ("ECDC Co-Signatory Director"), and a sitting North Carolina State Senator from the PDC Development Area ("State Senator"). The PDC Board adopted Bylaws and then passed a Resolution authorizing LaRoque to seek a $1 million IRP loan and a $250,000 RBEG grant.

48. PDC's Bylaws, which are almost identical to ECDC's Bylaws, include the following: (a) a listing of the eleven county development area to be served by PDC (see PDC Bylaws Art. II, Sec.

21

1); (b) a prohibition against any director of PDC "own[ing] any financial interest in any project receiving assistance from . . . " PDC (see PDC Bylaws Art. II, Sec. 3); (c) a prohibition against any member of PDC's Board member being "an officer, director or owner of any business receiving direct assistance from . . ." PDC (see PDC Bylaws Art. III, Sec. 4); (d) a requirement that "forty percent of directors then in office shall be necessary to constitute a quorum of the transaction of business; provided, however, that in no event shall a quorum be less then four (3) [sic] Directors. . ." (see PDC Bylaws Art. IV, Sec. 5); (e) a requirement that each director be provided with three days written notice prior to any Board meeting (see PDC Bylaws Art. IV, Sec. 3); (f) a provision stating that any Director that misses "three consecutive meetings or 50% of meetings held during the year will be considered as having resigned" (see PDC Bylaws Art. II, Sec. 9); and (g) a provision excluding the President of PDC from term limitations (PDC Bylaws Art. V, Sec. 2).

49. On September 30, 2003, LaRoque, as President and Intermediary Contact Person for PDC, filed a loan application requesting a $1,000,000 IRP loan ("PDC IRP Loan One"). In the application, LaRoque represented that PDC does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [PDC] has a substantial interest." LaRoque also submitted a Work Plan in support of the PDC's IRP Loan

22

Application in which it is represented that PDC will not make loans for the purpose of assisting "principals, directors, officers and employees of PDC and its affiliate organizations. Conflict of interest or the appearance of conflict of interest must be avoided." The Work Plan also requires PDC to be governed by a board consisting of members from each of the 11 counties listed in the PDC Development Area. Finally, LaRoque represented to the USDA that the federal loan was needed because PDC had "a prospect list with over 300 companies listed [from the PDC Development Area] that need funding . . . ."

50. On October 3, 2003, LaRoque formally incorporated PDC as a non-profit corporation under the N.C. Nonprofit Corporation Act. LaRoque also applied for PDC to be treated as tax exempt for federal tax purposes. In support of PDC's application for tax exempt status with the IRS, LaRoque stated that PDC would use his services to manage funds received from the USDA and that he "is intimately familiar with all USDA rules and regulations governing USDA small business grant and loan programs." PDC was granted Section 501(c)(3) tax exempt status in June of 2004.

51. On November 7, 2003, LaRoque, as President for PDC, filed a loan application requesting a $250,000 RBEG Grant ("PDC RBEG Grant").

52. On February 25, 2004, LaRoque filed an application with the USDA for a seventh ECDC IRP loan in the amount of $750,000

23

("IRP Loan Seven"). In the application, LaRoque left the box for his annual compensation blank. Prior to the loan closing, LaRoque provided the USDA with copies of ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to LaRoque. LaRoque also represented that ECDC would continue to operate in accordance with the original ECDC Work Plan and that ECDC does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [ECDC] has a substantial interest." The IRP Loan Seven was closed on July 23, 2004, and fully disbursed to ECDC during the period from August 2004, through April 2005.

53. In late April 2004, PDC held a Board meeting during which it authorized LaRoque to close the PDC IRP Loan One. Although not reflected in any PDC's Board minutes, the State Senator recalls a personal conversation with LaRoque during which they discussed the concept of LaRoque receiving percentage-based compensation from PDC.

54. On May 4, 2004, the ECDC Board had a meeting at the Kinston Country Club. During this meeting, the Board approved a budget for ECDC 2003-2004 fiscal year which increased LaRoque's compensation to $130,000. The Board also granted LaRoque's request to confirm a number of loans that he had made without prior Board approval.

55. On September 10, 2004, the PDC IRP Loan One, in the amount of $750,000, was closed. Notwithstanding LaRoque's claim that he had 300 prospective borrowers needing funding from PDC, PDC was not able to make its first loan until December of 2005, and was never able to find enough borrowers to fully draw on the entire $750,000 IRP loan.

56. In September of 2004, LaRoque incorporated his sole-proprietorship, LaRoque Management Group, and renamed it LaRoque Management Group, Inc. ("LMG"). LMG hired a part-time clerical assistant who was employed until approximately February of 2007. Following his incorporation of LMG, LaRoque began making some of his ECDC compensation checks as payable to LMG.

57. On November 2, 2004, LaRoque was re-elected to the North Carolina House of Representatives for North Carolina's Tenth District.

58. On December 23, 2004, LaRoque, as President of and contact person for ECDC, filed an application with the USDA for an eighth IRP loan in the amount of $750,000 ("IRP Loan Eight"), notwithstanding the fact that ECDC had approximately $1.4 million in funds on hand. In the application, LaRoque left the box for his annual compensation blank. Prior to closing the loan, LaRoque provided the USDA with copies of ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to LaRoque. LaRoque represented that ECDC would continue

to operate in accordance with the original ECDC Work Plan and that ECDC does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [ECDC] has a substantial interest." IRP Loan Eight was closed on June 15, 2005, and disbursed during the period from July 2005, through May 2006.

59. On January 21, 2005, the ECDC Board had a meeting at the Kinston Country Club. During this meeting, the Board approved a budget for ECDC 2004-2005 fiscal year which increased LaRoque's compensation to $136,000. The Board also granted LaRoque's request to confirm a number of loans that he had made without prior Board approval.

60. In April of 2005, LaRoque purchased a new black 2005 Toyota Avalon for $37,729 from Massey Motor Company in Kinston, North Carolina. Rather than finance the car purchase, LaRoque was able to fully pay the $37,729 purchase price by engaging in the following series of financial transactions:

   (a) <u>Tuesday, March 29, 2005</u>. ECDC check number 1973, dated March 29, 2005, in the sum of $12,900, was made payable to LMG. The check, which was deposited into LMG's First South Bank checking account, increased LMG's account balance to $17,125.08 on March 31, 2005. On this same date LMG wrote checks totaling $5,614.77, reducing LMG's balance to $11,510.31;

   (b) <u>Thursday, March 31, 2005</u>. ECDC check number 1974, dated March 31, 2005, in the sum of $24,100, was made payable to LMG. The memo line on the check contains the following reference: "02/03 - 03/04 Bonus";

26

(c) <u>Friday, April 1, 2005</u>. ECDC check number 1978, dated April 1, 2005, in the sum of $12,900, was made payable to LaRoque. The memo line on this check read "Feb Pay";

(d) <u>Friday, April 1, 2005</u>. The $24,100 check payable to LMG and the $12,900 check payable to LaRoque (which total $37,000) were both deposited directly into LMG's bank account at First South Bank. These deposits increased LMG's account balance to $48,510.31;

(e) <u>Saturday, April 2, 2005</u>. Massey Motor Company acknowledged receipt of LMG's check number 1046, in the sum of $37,728.50, in full payment of a 2005 black Toyota Avalon; and

(f) The Toyota Avalon was then registered in LMG's name, in order to facilitate LMG's plan to depreciate it as a business expense thereby reducing LMG's gross income.

61. The ECDC Co-Signatory Director resigned in late 2005. The last ECDC compensation check that is co-signed by the ECDC Co-Signatory Director is dated September 7, 2005.[16]

62. On December 12, 2005, LaRoque, as Executive Director and President of PDC, loaned $100,000 to a daycare facility at 9 percent annual interest. This was the first loan made by PDC in its history.

63. On December 15, 2005, LaRoque, as President of and contact person for ECDC, filed an application with the USDA for a ninth IRP loan in the amount of $750,000 ("IRP Loan Nine")

---

[16]On October 5, 2005, LaRoque did not have a co-signer on a $12,700 ECDC check to LMG. From November 2005, through at least August 2011, compensation checks made payable to LaRoque and LMG were all signed by LaRoque and co-signed by either the Susan's Carpet Owner (who would become his wife in 2007) or LaRoque's brother.

notwithstanding the fact that ECDC had approximately $2.8 million in revolved funds on hand. In the application, LaRoque left the box for his annual compensation blank. Prior to closing the loan, LaRoque provided the USDA with copies of ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to LaRoque. LaRoque also represented that ECDC would continue to operate in accordance with the original ECDC Work Plan and that ECDC does not "loan to . . . any business or organization in which an officer, director, or member of the intermediary [ECDC] has a substantial interest." On or about July 23, 2006, the $750,000 IRP Loan Nine was closed. The proceeds from this loan were fully disbursed to ECDC from October 2006, through October 2010.

### IV. LaRoque's Operation of ECDC and PDC from January of 2006, through December of 2008.

64. In or about early 2006, the State Senator, who was a Director of PDC, approached LaRoque about whether she could obtain a loan from PDC to fund her purchase of the building in which her business rented space. LaRoque informed her that she could obtain such a loan, but would need to resign from the PDC Board. In response, the State Senator resigned from the PDC Board.

65. On June 6, 2006, PDC held its first Board meeting since April 29, 2004. According to the unsigned minutes from the meeting, it was attended by LaRoque and the former ECDC Co-

Signatory Director, as directors, and LMG's clerical worker. Notwithstanding the presence of only two directors, LaRoque "confirmed that a quorum was present"[17] and then had the Board confirm a $134,000 loan (of which $33,750 would be funded by an RBEG grant) to the State Senator for the purchase of a building in which her company operated. The State Senator was charged 5 percent annual interest on her loan.

66. By the summer of 2006, ECDC's Board consisted primarily of LaRoque, LaRoque's brother, and the Susan's Carpet Owner. From August 2006, through August 2010, 10 of the 13 board meetings held by ECDC were attended by just these three directors. Likewise, during this same period, five of the six meetings held by the PDC Board were attended by just LaRoque, LaRoque's brother, and the Susan's Carpet Owner.

67. On September 12, 2006, LaRoque lost a special primary election to determine his party's candidate in the November 7, 2006, election for the North Carolina Representative seat for North Carolina District 10. During the primary campaign, LaRoque was sued by a supporter of his primary opponent for defamation. LaRoque retained an attorney based in Snow Hill ("Snow Hill Attorney") to defend him in the lawsuit.

---

[17]Accordance to PDC's Bylaws, this meeting did not have a sufficient quorum.

29

68. Although ECDC's 2005-2006 budget was neither submitted, nor approved, by the ECDC Board, ECDC paid LaRoque $107,700 in compensation ($30,000 to LaRoque and $77,700 in checks payable to LMG) and $5,175.19 in reimbursement expenses ($1,842.26 to LaRoque and $3,332.93 in checks payable to LMG) during this period.

69. On January 7, 2007, the State Senator's campaign committee contributed $2,000 to LaRoque's Campaign Committee.

70. On February 8, 2007, LaRoque held a Board of Directors meeting for PDC in Kinston. According to the minutes from the meeting, it was attended by LaRoque, the former ECDC Co-Signatory Director, and LaRoque's brother. LaRoque immediately "confirmed that a quorum was present" and then informed the Board that the State Senator had resigned from the Board due to "other obligations." At the meeting, the Board approved a $120,000 loan to a Billboard Company. This loan, the third in PDC's history, was advanced on February 12, 2007, at an annual rate of interest of 7.25 percent.

71. On April 18, 2007, LaRoque held a Board of Directors meeting for PDC in Kinston. According to the minutes, it appears that LaRoque opened the meeting as the only director present and then immediately "confirmed that a quorum was present." LaRoque then appointed LaRoque's brother and the Susan's Carpet Owner to the Board.

72. In April 2007, LaRoque purchased a 2006 white Toyota Tacoma from Massey Motor Company in Kinston, North Carolina, for $21,958.84. The truck, which had only been driven 288 miles, was put into LMG's name and depreciated against LMG's gross income for a number of years. LaRoque was able to fully pay the $21,958.84 purchase price using an LMG check, dated May 11, 2007, which was drawn on LMG's checking account at First South Bank. In order to cover this check, LaRoque deposited a $20,000 check into LMG's account which was drawn on his personal bank account at State Employees Credit Union ("SECU").

73. Although the LMG check provided to Massey Motor Company was honored by First South Bank, LaRoque's personal SECU $20,000 check to LMG bounced on May 14, 2007. To remedy this situation, on May 24, 2007, LaRoque and Susan's Carpet Owner executed an ECDC check in the sum of $20,000 made payable to "Stephen A. LaRoque." LaRoque deposited the $20,000 into his SECU account on May 24, 2007, and SECU then honored the $20,000 check that had previously bounced.

74. On June 4, 2007, the PDC Board, which consisted of LaRoque, the Susan's Carpet Owner, and LaRoque's brother, met in Kinston and voted to make a $150,000 loan to a sitting member of the North Carolina State House of Representatives ("State Representative") to develop a mobile home park on leased land. The

31

loan was disbursed on or about July 25, 2007, at an annual rate of interest of 6 percent.

75. On July 7, 2007, LaRoque and the Susan's Carpet Owner (hereinafter "LaRoque's wife") were married.

76. Although ECDC's 2006-2007 budget was neither submitted, nor approved, by the ECDC Board, ECDC paid LaRoque $195,000 in compensation ($170,000 to LaRoque and $25,000 in checks payable to LMG) and $7,796.87 in reimbursement expenses ($2,548.31 to LaRoque and $5,248.56 in checks payable to LMG) during this period. All compensation checks written to LaRoque and LMG during this period were signed by LaRoque and co-signed by either LaRoque's brother or LaRoque's wife.

77. During the fiscal year from October 1, 2007, through September 30, 2008, ECDC had two Board meetings and PDC had one Board meeting. The Directors at each of these Board meetings consisted of LaRoque, LaRoque's wife, and LaRoque's brother.

78. On November 5, 2007, LaRoque and LaRoque's wife signed an ECDC check, in the sum of $10,000, payable to LaRoque.

79. At the sole PDC Board meeting in 2007, which occurred on December 14, 2007, the Board voted to make a $185,000 loan ($80,250 of which was funded with an RBEG grant) to the construction company that was leasing the land to the State Representative for a mobile home park. The loan to the construction company, which charged an

32

annual rate of interest of 6%, was funded on or about January 4, 2008. This is the last new borrower to which PDC loaned money.

80. ECDC also held a Board meeting on December 14, 2007, which was attended by LaRoque, LaRoque's wife, and LaRoque's brother. During the meeting, ECDC's 2007-2008 budget was unanimously passed by LaRoque, LaRoque's wife, and LaRoque's brother. LaRoque provided the USDA with copies of ECDC's financial statements and projections pertaining to, among other things, the compensation to be paid to LaRoque for the 2007-2008 period.

81. On or about January 10, 2008, LaRoque and LaRoque's wife signed an ECDC check, in the sum of $50,000, payable to LaRoque.

82. On or about February 19, 2008, a week before the birthday of LaRoque's wife, LaRoque made a $9,269.50 charge on his Visa Credit Card in purchase of the following items of jewelry from Vicci Fine Jewelry in The Forum Shops at Caesars Palace in Las Vegas, Nevada: (a) a "D.40 CTW 18K YG" Brown Enamel Faberge Egg at a cost of $5,104.50; (b) an "18" WG Link" Blue Enamel Faberge Egg at a cost of $3,170; (c) an "18K YG Link Chain" at a cost of $920; and (d) a $75 postage charge.

83. On Friday, April 4, 2008, LaRoque made an $11,323.65 e-payment on the balance owed on his Visa Credit Card, which included the charge for his $9,269.50 jewelry purchases in Las Vegas. On Monday, April 7, 2008, LaRoque and LaRoque's brother executed an ECDC check, in the sum of $40,000, payable to the LMG. This check

33

was deposited into LMG's bank account at RBC Centura. On this same date, a $40,000 LMG check was executed by LaRoque and deposited into his personal bank account at SECU.

84. On May 8, 2008, LaRoque and LaRoque's wife executed an ECDC check, in the sum of $25,000, payable to LaRoque.

85. On June 16, 2008, LaRoque extended a $50,000 ECDC loan to the Snow Hill attorney. The ECDC check to the Snow Hill attorney was executed by LaRoque and LaRoque's wife and made payable to the Snow Hill attorney and his wife.

86. On July 24, 2008, LaRoque made a $17,000 ECDC loan to a one-person long distance trucking company located in Oxford, North Carolina, a city outside of ECDC Development Area.

87. By mid-2008, LaRoque's wife was in negotiations with a potential purchaser of Susan's Carpet. The Snow Hill attorney would ultimately represent her in the sale of her business. On July 25, 2008, LaRoque's wife received a down payment of $125,000 in connection with the sale of Susan's Carpet. The closing of the sale was held in January 2009.

88. On August 15, 2008, ECDC held a Board meeting which was attended by LaRoque, LaRoque's wife, and LaRoque's brother. During the meeting, the Board reviewed the budget for ECDC's 2008-2009 tax year which included $150,000 to be paid to LaRoque. The budget was unanimously passed by LaRoque, LaRoque's wife, and LaRoque's brother. LaRoque provided the USDA with copies of ECDC's financial

statements and projections pertaining to, among other things, the compensation to be paid to LaRoque for the 2008-2009 period. The Board also granted LaRoque's request to confirm a $17,000 loan to the Oxford truck driver and to approve a new $15,000 loan to the Oxford truck driver. The Board minutes do not reflect any discussions about making a loan to a borrower located outside of ECDC's Development Area.

89. At ECDC's Board meeting on August 15, 2008, LaRoque requested that the Board confirm his earlier loan of $50,000 to the Snow Hill attorney and approve a new $100,000 loan.[18] LaRoque then explained that the purpose of the new loan would be to provide the Snow Hill attorney with some "working capital for expansion and the opening of an additional office in Greenville, NC." The minutes from this meeting reflect no discussion of the fact that the location of the Snow Hill attorney's new Greenville office was not located in a "rural" area and, therefore, could not be funded with an ECDC loan.

90. On August 26, 2008, LaRoque wrote to the USDA and requested a $100,000 disbursement from ECDC IRP Loan Nine for a loan to the Snow Hill attorney and his wife. In the letter, LaRoque stated the loan's purpose as follows: The borrower "is a law firm located . . . [in] Snow Hill, Greene County, NC. Loans

---

[18]Although the ECDC Board Minutes suggest that an additional $100,000 was to be loaned to the Snow Hill attorney, the ultimate transaction simply increased the existing $50,000 loan to $100,000.

funds will be used for working capital." During his communications with the USDA, LaRoque failed to disclose that the funds were going to be used by the Snow Hill attorney to open an office in a non-rural area. LaRoque also failed to inform the USDA that only about half of the newly disbursed funds would actually be paid to the Snow Hill attorney, with the remaining half increasing ECDC's funds on hand. On September 2, 2008, the USDA transferred $100,000 in federal funds to ECDC's bank account at RBC Centura Bank in Kinston, North Carolina, from the United States Department of Treasury in Washington, DC. After receiving the $100,000 disbursement from the USDA, LaRoque disbursed the funds as follows: (a) ECDC check number 2576, dated September 3, 2008, in the sum of $48,529.95, payable to "ECDC for . . . [Snow Hill attorney and his wife]"; and (b) ECDC check number 2577, dated September 3, 2008, in the sum of $50,000, payable to the Snow Hill attorney and his wife.

91.  On August 28, 2008, LaRoque and LaRoque's wife signed an ECDC check, in the sum of $10,000, payable to LaRoque.

92.  In the Fall of 2008, LaRoque was involved in a tough campaign for the North Carolina House of Representatives and was in need of funds.

93.  On October 1, 2008, LaRoque and LaRoque's wife signed an ECDC check, in the sum of $25,000, payable to the LMG. The check was deposited into LMG's bank account. On October 20, 2008, LMG

36

made a $25,000 loan to the "Committee to Elect Stephen LaRoque" which was paid with a check written against LMG's bank account.

94. On November 4, 2008, LaRoque lost in the general election for the North Carolina House seat for North Carolina District 10 by 941 votes.

95. On November 19, 2008, LMG made a $3,000 loan to the "Committee to Elect Stephen LaRoque" which was funded with a check written against LMG's bank account.

## V. Form 990 Tax Returns filed by ECDC and PDC for Periods Prior to 2008-09 Fiscal Year.

96. As noted above, because ECDC and PDC operated as Section 501(c)(3) tax exempt entities for purposes of the Internal Revenue Code, they were required to file Form 990 tax forms each year in which they had at least $25,000 in gross income. The Form 990s, each of which was signed by LaRoque under penalties of perjury, contain disclosures about the non-profit's officers, directors, and key employees, including compensation earned by such persons. The following table summarizes the information disclosed by ECDC regarding LaRoque's compensation on the listed Form 990s:

| ECDC Tax Year | Position and Hours Worked | Compensation |
|---|---|---|
| 2002-03 | Executive Director and President 40 hours per week | $ 124,750 |
| 2003-04 | Executive Director 40 hours per week | 109,300 |

37

| 2004-05 | Executive Director 40 hours per week | 187,800 |
|---------|--------------------------------------|---------|
| 2005-06 | Executive Director 40 hours per week | 107,035 |
| 2006-07 | Executive Director 50 hours per week | 195,000 |
| 2007-08 | Executive Director 40 hours per week | 135,000 |

97. In none of the above-referenced Form 990s did LaRoque disclose either deferred compensation owed to him by ECDC or any amounts whatsoever paid to LMG.

98. The Form 990s filed by PDC for its 2006-2007 and the 2007-2008 fiscal years, each of which was signed by LaRoque under penalties of perjury, represented that LaRoque worked 20 hours per week in fulfilling his positions at PDC during each year. In each Form 990, LaRoque stated that he earned no compensation for his work at PDC. Likewise, LaRoque did not disclose either deferred compensation owed to him by PDC or any amounts whatsoever paid to LMG.

## VI. LaRoque's Theft of Funds from ECDC and PDC during the Period from 2009 through 2012 to Fund his Personal Financial Obligations.

99. On December 9, 2008, LaRoque used his Visa credit card to purchase $15,168 worth of jewelry from Liljenquist & Beckstead Jewelers, which is located in Tysons Galleria, McLean, Virginia. The items purchased were as follows:

38

| Description of Item | Price |
|---|---|
| "FABERGE LARGE BLUE ENAMEL AND DIA EGG. EGG OPENS WITH CROWN INSIDE" | $ 3,798.00 |
| "FABERGE LRG. LT. BLUE ENAMEL EGG" | 2,262.00 |
| "SMALL RED ENAMEL FABERGE WITH GOLD CRISSCROSS DESIGN" | 678.00 |
| "LRG RED ENAMEL FABERGE EGG WITH GOLD FRAME ON THE OUTSIDE. DIAMONDS GO AROUND THE CENTERSTYLE" | 2,472.00 |
| "FABERGE SMALL PALE YELLOW EGG PENDANT WITH CHAIN . . . 18KT YELLOW GOLD" | 804.00 |
| "FABERGE SML LIME GREEN EGG WITH BEZEL SET DIA STYLE" | 684.00 |
| "FABERGE OPEN SWIRL EGG WITH CHANNEL SET RUBYS AND 4 DIAMONDS" | 1,092.00 |
| "FABERGE TRI COLORED ENAMEL LARIAT NECKLACE WITH THREE EGGS. ONE LT. PEACH, CARK PEACH, AND WINE. GOLD CHAIN HAS 4 ROUND PEACH ENAMEL BALLS" | 2,748.00 |
| "FABERGE RED ENAMEL EARRING | 630.00 |

100. On December 11, 2008, LaRoque used his Visa credit card to purchase a "LARGE FABERGE YELLOW ENAMEL EGG WITH A DIA SWIRL IN THE CENTER" at a cost of $1,284 at Liljenquist & Beckstead Jewelers.

101. LaRoque paid the Visa bill relating to the $16,452 in jewelry purchases from Liljenquist & Beckstead by making an

39

electronic e-payment on Monday, January 5, 2009, from his personal bank account at SECU, in the sum of $18,794.03. In order to fund this e-payment, LaRoque engaged in the following series of transactions on the previous Friday:

(a) <u>Friday, January 2, 2009</u>. On this date, LaRoque and LaRoque's Wife executed ECDC check number 2605, in the sum of $50,000, which was made payable to LMG. The check was deposited into LMG's bank account at RBC Centura; and

(b) <u>Friday, January 2, 2009</u>. On this same date, LaRoque executed LMG check number 1735, in the sum of $30,000, payable to "Stephen LaRoque." The check was deposited into LaRoque's personal bank account that was used on Monday, January 5, 2009, to fund the e-payment.

102. On January 2, 2009, LaRoque's wife received a $160,000 check made payable to her and a $140,000 check made payable to her corporate entity in full payment of the amount owed for the sale of Susan's Carpet. As noted above, the Snow Hill attorney represented her in this transaction.

103. On January 12, 2009, LaRoque's wife used $200,000 from her personal checking account and $40,000 from the checking account of "The Flooring Gallery," to purchase two Certificates of Deposit ("CDs"), each having a maturity date in July 2009.

104. By January 2009, LaRoque's wife and her daughter from a prior marriage ("Step-daughter One") had begun exploring the possibility of purchasing a business named Bladez on Ice, which was located in Greenville, North Carolina. LaRoque's wife planned to

use a portion of the proceeds from her sale of Susan's Carpet to fund the purchase of Bladez on Ice.

105. On January 22, 2009, a former ECDC director who had not attended an ECDC Board meeting since April of 2007 ("Former Director"), attended an ECDC Board meeting in ECDC's offices. The meeting was attended by LaRoque, LaRoque's wife, LaRoque's brother, and the Former Director. After introducing a recently hired LMG employee to the Board, LaRoque appointed LaRoque's wife, LaRoque's brother, and the Former Director to the Board. LaRoque then instructed the LMG employee to leave the room and began addressing a renewal of his ECDC management contract. Although the Board was not given a copy of the proposed management contract, it voted unanimously to approve the contract.

106. Following the ECDC Board meeting, the PDC Board, consisting of LaRoque, LaRoque's Wife, and LaRoque's Brother, held a meeting. According to the minutes, LMG's new staff member was again introduced to the Board. After LMG's new staff member was instructed to leave, the PDC Board, for the first time in its existence, reviewed PDC's financial records. The financial records reflect neither compensation paid to, nor owed to, LaRoque. LaRoque then briefly summarized the terms of a management contract between him and PDC. Although the PDC Board was not provided with an actual copy of the contact, it voted to confirm the contract "unanimously with Mr. Stephen LaRoque abstaining."

41

107. On the same date as the ECDC and PDC Board meetings, LaRoque, in his individual capacity, and LaRoque's wife, as "Chair" of both ECDC and PDC, signed documents entitled "Agreement." Each purported agreement was made retroactive to the outset of ECDC and PDC's business operations. The agreements, which are virtually identical, provide LaRoque with the following compensation package:

> Contractor's compensation shall be paid monthly and based upon the annual rate of Three per cent (3%) **of ECDC's [PDC's] assets**. Administration fees shall be payable on the first day of the month services is provided. ECDC [PDC] shall pay contractor **one half (½) of all loan fees** collected. ECDC shall pay contractor **ten per cent (10%) of annual profit** payable in the month following the fiscal year end and is effective as of October 1, 1999 [or, in PDC's case, May 3, 2004].

> \*    \*    \*    \*

> Beginning May 1, 1998 [or, in PDC's case, May 3, 2004], and throughout the period of this agreement, Contractor shall be reimbursed for **all expenses**.

(emphasis added). Although USDA Regulations allow an Intermediary to use contract personnel to administer an IRP program, the USDA Regulations require that an Intermediary's work plan provide for the following:

> If the personnel are to be contracted for, the contract between the intermediary and the entity providing such service will be submitted for Agency [USDA] review, and the terms of the contract and its duration must be sufficient to adequately service the Agency [USDA] loan through to its ultimate conclusion.

42

7 C.F.R. § 4274.343(a)(2)(I). LaRoque failed to submit the January 2009 contracts to the USDA for a review of each contract's terms or for a review of the retroactive nature of each contract.

108. PDC's pre-2009 board minutes and Form 990s indicate that LaRoque would receive no compensation for servicing the small number of loans that PDC was able to generate. Similarly, the PDC's pre-2009 financial reports submitted to the USDA by LaRoque make no reference to LaRoque receiving any compensation from PDC. As to ECDC, nowhere in ECDC's pre-2009 Board minutes or Form 990s is there a disclosure that LaRoque would receive portions of ECDC's profits and the loan fees charged to ECDC's borrowers. Likewise, the pre-2009 ECDC Board minutes and Form 990s make no reference to LaRoque's compensation being computed based on three percent of gross assets. In light of LaRoque's practice of stockpiling cash, such an agreement would have significantly increased his pay over the years.[19]

109. The purported contracts executed by LaRoque and LaRoque's wife on January 22, 2009, which were made retroactive to the outset of ECDC and PDC's respective operations, also contradict disclosures made by LaRoque about his compensation in IRP loan

_____

[19]The terms of the purported contract executed by LaRoque and LaRoque's Wife on January 22, 2009, would entitle LaRoque to $30,000 per year compensation for each $1 million amount that ECDC managed to stockpile. As of February 1, 2009, LaRoque had stockpiled $3,416,102 in ECDC's bank accounts. Under the purported agreement, ECDC would be obligated to pay LaRoque additional compensation of $102,483.07 per year simply for having such amount deposited into bank accounts.

43

applications submitted to the USDA over the years. The purported management contracts also violate the USDA regulations limiting payment of contractor fees to the actual cost of operating the IRP revolving fund. The ECDC and PDC financial reports provided to the USDA by LaRoque over the years do not reflect compensation owed to him based on the terms contained in the retroactive January 2009 contracts. Similarly, the ECDC and PDC financial reports fail to disclose any retained earnings owed by either entity to LaRoque.

110. The purported ECDC January 2009 contract is also contrary to the budget approvals passed by the ECDC Board during the period from 1999-2009.

111. On February 1, 2009, ECDC had funds available in the sum $3,416,102.55. Notwithstanding this fact, on February 13, 2009, ECDC submitted an application for a tenth IRP loan in the sum of $750,000 ("IRP Loan Ten").[20] In the application, LaRoque left the box for his annual compensation blank. Prior to closing the loan, LaRoque provided the USDA with a copies of ECDC financial statements and projections which failed to disclose the compensation purportedly owed to LaRoque pursuant to the January 22, 2009, contract that he and his wife had executed. The application, which LaRoque signed as President and Intermediary

_____

[20]Under the purported contract executed by LaRoque and LaRoque's wife on January 22, 2009, the receipt of the $750,000 in proceeds from such a loan would have increased LaRoque's annual compensation by $22,500. It does not appear from ECDC's corporate records that LaRoque recused himself from the decision to seek this additional federal loan.

44

Contact Person, represents that ECDC "will operate the proposed Intermediary Relending Program loan" in accordance with the original ECDC Work Plan and that ECDC does not "loan to . . . any businesses or organization in which an officer, director, or member of the intermediary has a substantial interest."

112. On February 25, 2009, the owners of Bladez on Ice provided a "Letter of Intent to Sell Business Assets" to LaRoque's wife and Step-daughter One for $525,000. Bladez on Ice is an ice skating rink which consists of a leasehold interest in the ice rink, equipment necessary to operate an ice skating rink, and the goodwill associated with its history of operation. The terms of the letter required a down payment of $40,000, with the remaining $485,000 due at a closing in June 2009. On or about February 26, 2009, LaRoque's Wife made a $40,000 down payment on the purchase of Bladez on Ice. LaRoque's wife funded this down payment by taking an advance on a "Prime Equity Line" that she had at Wachovia Bank.

113. On May 6, 2009, the USDA approved ECDC's request for a $50,000 disbursement against IRP Loan Nine for use in funding a $50,000 loan to the Snow Hill attorney. The funds were advanced to ECDC on or about May 6, 2009, and disbursed to the Snow Hill Attorney on August 6, 2009. At the time ECDC received this advance

45

on IRP Loan Nine, it had in excess of $3.4 million in revolved funds on hand.[21]

114. On May 8, 2009, LaRoque and LaRoque's wife executed an ECDC check in the sum of $25,000 payable to LaRoque.

115. On or about June 11, 2009, LaRoque's wife, using the corporate shell of Susan's Carpet, purchased Bladez on Ice. At the closing, LaRoque's wife paid $240,000 and executed a promissory note in the sum of $245,000.

116. In the weeks following her purchase of Bladez on Ice, LaRoque's wife sold an eight percent interest in Bladez on Ice to a neighbor in exchange for a cash payment of $40,000. This reduced her interest in Bladez on Ice to 92 percent. Stephen LaRoque then agreed to purchase a 46 percent interest in Bladez on Ice from his wife.

117. On June 19, 2009, LaRoque called meetings of the Boards of ECDC and PDC. The meetings were attended by LaRoque, LaRoque's wife, and LaRoque's brother. According to the minutes from each meeting:

> Mr. Stephen LaRoque asked the Board to approve a loan to LaRoque Management Group, Inc. (LMG) based on earned income not yet distributed to LMG. A brief discussion followed and a motion to approve the loan was made by . . . [LaRoque's brother] and seconded by . . .

---

[21]Under the terms of his purported January 2009 contract, LaRoque's decision to fund the new $50,000 loan with an IRP advance, rather than revolved funds, would increase the yearly compensation owed to him by ECDC by $1,500.

[LaRoque's wife].  The  motion  passed unanimously.

Although  such  authorization  was  in  contravention  of  the  loan prohibitions  contained  in  ECDC's  Bylaws  and  Work  Plan,  LaRoque  did not  provide  notice  to  the  USDA  of  any  intent  to  change  ECDC's Bylaws  and  Work  Plan.  In  addition,  there  is  no  mention  in  the minutes  about  the  fact  that  such  action  violates  USDA  regulations, Section  55A-8-32  of  the  N.C.  Nonprofit  Corporation  Act,  and  a representation  contained  in  the  IRP  Loan  Ten  application,  which  was then  awaiting  USDA  approval.  There  is  also  no  mention  of  the  fact that  each  of  the  Directors  who  voted  on  the  action  had  a  conflict of  interest  that  should  have  prevented  them  from  participating  in the  vote,[22]  nor  the  fact  that  the  intended  loan  was  being  made  to fund  an  investment  in  an  ice  skating  rink  located  in  an  area  which did  not  qualify  for  loans  under  USDA  regulations  and  the  ECDC  Work Plan.

118. On June 26, 2009, LaRoque engaged in the following series of  financial  transactions  in  order  to  effectuate  his  personal investment in Bladez on Ice:

    (a)   <u>Friday, June 26, 2009</u>. LaRoque and LaRoque's wife executed ECDC check number 2634, in the sum of $150,000, payable to LMG, with the following reference in the memo space of the check: "Loan to Contractor;"

---

[22]At the time of the vote, LaRoque was the sole owner of LMG, LaRoque's Brother had a business relationship with LMG, and the loan to LMG was intended to be used to purchase half of his wife's remaining interest in Bladez on Ice.

47

(b) <u>Friday, June 26, 2009</u>. LaRoque deposited the $150,000 check into LMG's account at the Kinston Plaza branch of RBC Centura;

(c) <u>Friday, June 26, 2009</u>. LaRoque executed LMG check number 1861, in the sum of $141,500, payable to Bladez on Ice, with the following reference in the memo space of the check: "Purchase Ownership Interest in Business;"

(d) <u>Friday, June 26, 2009</u>. LaRoque used the $141,500 check to purchase an "Official Check" at RBC Centura Kinston Plaza branch made payable to Bladez on Ice in the sum of $141,500;

(e) <u>Friday, June 26, 2009</u>. LaRoque then traveled to a Wachovia Bank branch in Kinston and deposited the $141,500 "Official Check" into Bladez on Ice's bank account; and

(f) <u>Friday, June 26, 2009</u>. Step Daughter One executed Bladez on Ice check number 1017, in the sum of $96,500, payable to LaRoque's wife, with the following reference in the memo space of the check: "Loan Repayment."

119. A Promissory Note in the sum of $150,000, bearing the date of June 26, 2009, was executed by LaRoque, as President of LMG, with ECDC as the lender. The purported loan of funds from ECDC to LMG, a company wholly-owned by LaRoque, violated two different ECDC Bylaw provisions. LaRoque also failed to disclose the existence of this purported loan in ECDC's Form 990 for such period or in connection with IRP Loan Ten, which was closed in October of 2009. The purported loan also violated portions of USDA regulations, the N.C. Nonprofit Corporation Act, and the ECDC Work Plan. In ECDC's audited financial statement for the fiscal year 2008-2009, the existence of this improper loan was concealed in a

48

category separate from all other ECDC loans. The existence of this loan was not disclosed by LaRoque on either the listing of ECDC loan recipients that he provided to the USDA or on the portion of the ECDC's audited financial statement which lists the percentage rate charged to ECDC's borrowers.

120. Neither LMG, nor LaRoque, were required to execute any documents securing this purported indebtedness. Under the terms of the promissory note, ECDC agreed to allow LMG to allegedly borrow such funds at an interest rate of zero. According to a review of ECDC's audited financial statements, during its entire history it had never loaned money to a borrower for zero percent interest.

121. On or about July 13, 2009, a $45,000 payment was made on the $245,000 promissory note executed by Susan's Carpet in connection with the purchase of Bladez on Ice.

122. On or about July 23, 2009, LaRoque's wife incorporated JESE, Inc., d/b/a Bladez on Ice, and transferred ownership of Bladez on Ice to JESE. Although the name "JESE" is taken from Step-daughter One's initials, she is not listed as an owner of JESE. LMG, who made what is described on the $141,500 check as an investment in Bladez on Ice, also failed to receive an ownership interest. Instead, the owners of JESE are listed as LaRoque (based on the money paid in by LMG), LaRoque's wife, and the neighbor of LaRoque's Wife who invested $40,000 cash into Bladez on Ice. The neighbor, who is in the gaming industry, did not obtain any type of

49

written receipt for his $40,000 cash investment, but is reflected as an eight percent owner on JESE, Inc.'s tax return. LaRoque and LaRoque's wife are each listed as 46% owners of JESE.

123. On July 31, 2009, LaRoque and LaRoque's wife executed an ECDC check in the sum of $25,000 payable to LaRoque.

124. On August 28, 2009, LaRoque and LaRoque's wife executed an ECDC check in the sum of $25,000 payable to LaRoque.

125. On October 28, 2009, ECDC and the USDA closed IRP Loan Ten without disclosing the existence of the agreement signed by LaRoque and LaRoque's wife on January 22, 2009, or the purported $150,000 loan from ECDC to LMG. Instead, LaRoque provided the USDA with financial reports which concealed the amounts he claims to be owed under the January 2009 contract with ECDC. LaRoque also falsely represented to the USDA that ECDC "will operate in accordance with its current approved Work plan." During the closing, LaRoque executed a Security Agreement in which he falsely represented that statements in the February 13, 2009, ECDC IRP Ten Loan Application were true and correct. As noted above, LaRoque represented in the February 13, 2009, Loan Application that ECDC does not "loan to . . . any businesses or organization in which an officer, director, or member of the intermediary has a substantial interest."

126. During ECDC's 2008-2009 fiscal year, it paid LaRoque $317,800 in compensation ($90,000 to LaRoque and $227,800[23] in checks payable to LMG) and $19,761.47 in reimbursement expenses (all of which were paid with checks payable to LMG). The financial statements and projections provided to the USDA by LaRoque in 2009 failed to disclose the $150,000 paid to LaRoque in the form of a purported loan to LMG. During this period, ECDC made less than ten new loans, including the loans to LMG and the Snow Hill Attorney.

127. The Form 990 filed by ECDC for the 2008-2009 tax year, which was executed by LaRoque under penalties of perjury, represents that LaRoque worked 45 hours per week in fulfilling his position at ECDC and received $167,500 in compensation from ECDC. This disclosure fails to account for the $150,000 paid to LMG on June 26, 2009, and used to fund LaRoque's personal investment in Bladez on Ice. In response to a question relating to whether ECDC had any outstanding loans to officers or directors, LaRoque answered "no." In response to a question relating to whether ECDC had business relationship with an entity owned by an officer or director, LaRoque answered "no." In response to a question regarding whether ECDC had paid or accrued any compensation to an officer or director based on revenues or net earnings, LaRoque answered "no." In response to the portion of the Form 990

---

[23]This amount includes the $150,000 purportedly loaned by ECDC to LMG.

Case 4:12-cr-00088-H   Document 32   Filed 04/17/13   Page 51 of 77

requiring ECDC to list any deferred compensation owed to LaRoque, LaRoque reported no such compensation owed.

128. The Form 990 filed by PDC for the 2008-2009 tax year, which was executed by LaRoque as President of PDC, represents that LaRoque worked 20 hours per week in fulfilling his duties as President of PDC. In response to the portions of the Form 990 regarding compensation owed by PDC to LaRoque, PDC lists no compensation owed.

129. On or about October 14, 2010, LaRoque and LaRoque's wife filed their joint 2009 Federal Income Tax Return. On the return LaRoque willfully understated his federal tax liability.

130. During the fiscal year October 1, 2009, through September 30, 2010, PDC had no Board meetings and ECDC had three board meetings. The directors at each of the three ECDC meetings were limited to LaRoque, LaRoque's wife, and LaRoque's brother.

131. On January 6, 2010, LaRoque and LaRoque's wife executed an ECDC check in the sum of $50,000 payable to LaRoque.

132. In the months following the purchase of Bladez on Ice by Susan's Carpet, a dispute arose regarding the condition of some of the assets included in the purchase price. As a result, the Snow Hill attorney entered into negotiations with the seller in an effort to obtain an agreed reduction in the balance due on the promissory note executed by Susan's Carpet. Ultimately, the promissory note was assigned to the owner of the building in which

52

Bladez on Ice operates, who agreed to accept $66,000 in full payment of the remaining amount owed on the note.

133. On January 29, 2010, LaRoque and LaRoque's wife, in their capacities as President and Chairman of ECDC, executed an ECDC check in the sum of $50,000 payable to "LaRoque Management Group." The following words appear in the memo space of the ECDC check: "Loan Proceeds Earnings." On February 4, 2010, LaRoque, in his capacity as sole-shareholder of LMG, executed an LMG check in the sum of $66,000 in payment of promissory note owed by Susan's Carpet in connection with the purchase of Bladez on Ice. LMG received no ownership interest in Bladez on Ice as a result of this transaction.

134. The purported $50,000 loan from ECDC to LMG, a corporation wholly-owned by LaRoque, violates two provisions of ECDC's Bylaws, ECDC's Work Plan, USDA regulations, N.C. Nonprofit Corporation Act §55A-8-32, and each of the ten IRP loan applications. The existence of this loan was not disclosed by LaRoque on the listing of ECDC loan recipients provided to the USDA.

135. On January 29, 2010, LaRoque, in his capacity as President of ECDC, marked the $150,000 LMG promissory note paid in full and then, in his capacity as President of LMG, executed a new promissory note in favor of ECDC in the sum of $200,000. Under the

53

terms of the new promissory note, ECDC agreed to allow LMG to borrow such funds at an interest rate of zero.

136. In March of 2010, a step daughter of LaRoque's wife from her first marriage ("Step-daughter Two") was in need of a place for her family to live. On March 5, 2010, LaRoque and LaRoque's wife, in their capacities as President and Chairman of ECDC, executed an ECDC check in the sum of $50,000 payable to "LaRoque Management Group." The following words appear in the memo space of the ECDC check: "PDC - Loan Against Earnings - Current."[24] ECDC did not require LMG to execute a promissory note or any security documents in connection with this payment. The purported $50,000 loan from ECDC to LMG, a corporation wholly-owned by LaRoque, violated two provisions of ECDC's Bylaws, ECDC's Work Plan, USDA regulations, N.C. Nonprofit Corporation Act §55A-8-32, and the ten IRP loan applications submitted to the USDA. The existence of this loan was not disclosed by LaRoque on the listing of ECDC loan recipients provided to the USDA.

137. After executing the $50,000 check to LMG, LaRoque deposited the funds into LMG's bank account and then used the money to cover a portion of a check to the Snow Hill attorney in the sum of $89,482.22. The $89,482.22 check was used by the Snow Hill attorney to close the purchase of a house for LaRoque to rent to

---

[24]On this same date, $50,000 in funds were transferred from PDC's "IRP Account" to ECDC's "IRP Account."

Step-daughter Two. The house, which was purchased at a foreclosure sale, was titled in the name of LaRoque and LaRoque's wife.

138. On April 1, 2010, ECDC made another loan to the Snow Hill Attorney, in the sum of $100,000. The ECDC loan was funded through an ECDC check executed by LaRoque and made payable to the Snow Hill attorney's law firm. The proceeds used to fund the check were taken from revolved funds. Notwithstanding the fact that the loan had been fully funded with revolved funds, LaRoque submitted a request to the USDA for an IRP advance of $100,000 to be loaned to the Snow Hill attorney.[25]

139. In April 2010, LaRoque engaged in an email correspondence with investigators from the North Carolina Board of Elections ("NC-BOE") in connection to an investigation into the $28,000 in loans that LMG had made to LaRoque's Campaign Committee. On April 13, 2010, LaRoque submitted responses to a number of questions posed by the NC-BOE investigator. Included in the e-mail was the following:

> 9. Does LMG receive any funds from the non-profit organizations [ECDC and PDC]?
>
> I have a management contract with the two non-profit organizations to manage both of them in all aspects with the primary responsibility including Administration, Marketing, Loan Packaging and Loan Servicing. LMG performs

---

[25]Included in the disbursement request was a "No Conflict of Interest" form executed by LaRoque, the Snow Hill attorney, and the Snow Hill attorney's wife, stating that ECDC and its officers (and family) have "no legal or financial interest or influence in the ultimate recipient" and that the Snow Hill attorney's firm has "no legal or financial interest or influence in" ECDC.

loan underwriting for another non-profit
organization on an as needed basis for a fee.

Although not included in LaRoque's response to the NC-BOE, as of this date, LMG had received three checks, totaling $250,000, from ECDC each of which purports to be a loan to LMG.

140. On April 14, 2010, LaRoque and LaRoque's wife executed an ECDC check in the sum of $20,000 payable to the LMG.

141. On or about April 15, 2010, the Snow Hill attorney contributed $2,500 to LaRoque's Campaign Committee.

142. By May 2010, it had become clear that the 1974 Zamboni ice resurfacer purchased by LaRoque's wife when she bought Bladez on Ice needed to be replaced. Consequently, on May 7, 2010, LaRoque and LaRoque's wife, in their capacities as President and Chairman of ECDC, executed an ECDC check in the sum of $50,000 payable to "LMG." The following words appear in the memo space of the ECDC check: "Loan Proceeds - PDC."[26] ECDC did not require LMG to execute a promissory note or any security documents in connection with the purported $50,000 loan. The purported $50,000 loan from ECDC to LMG, a corporation wholly-owned by LaRoque, also violated two provisions of ECDC's Bylaws, ECDC's Work Plan, USDA regulations, N.C. Nonprofit Corporation Act §55A-8-32, and each of the ten IRP loan applications. The existence of this loan was not

---

[26]Because PDC did not have funds sufficient to fund this purported loan to LMG, it was unable to reimburse ECDC for the payment until January of 2011. The existence of ECDC's loan to PDC was neither secured by loan documents nor disclosed in any periodic listing of loan recipients provided to the USDA.

disclosed by LaRoque on the listing of ECDC loan recipients provided to the USDA.

143. On May 7, 2010, LaRoque executed an LMG check in the sum of $4,500, payable to the L.S.K. Enterprises, Inc., for Bladez on Ice's rental of an ice resurfacer and an LMG check in the sum of $20,000, payable to L.S.K. Enterprises, as down payment on the purchase of a 1997 Olympia Ice Resurfacer that would be ready for delivery in August. On August 10, 2010, LaRoque executed an LMG check in the sum of $21,000 in payment of the balance owed on the purchase of the Olympia Ice Resurfacer. LMG received no ownership interest in Bladez on Ice as a result of these transactions.

144. On May 7, 2010, LaRoque, in his capacity as President of ECDC, marked the $200,000 LMG promissory note that had been created on January 29, 2010, as paid in full. Although none of the $200,000 had been repaid to ECDC, it does not appear that LMG executed another promissory note relating to this amount until almost two months later on July 1, 2010. The July 1, 2010, promissory note extended the date of repayment to May 1, 2011, keeping the annual interest rate at zero percent.

145. On or about August 7, 2010, LaRoque made $3,114 worth of charges on two Visa Credit Cards in purchase of the following items of jewelry from Diamonds Direct Crabtree in Raleigh: (a) a "14KWG Dia Earrings 0.32TW"; and (b) a "14W 2.35 Ct Black Dia VS2." On

August 11, 2010, LaRoque and LaRoque's wife executed an ECDC check in the sum of $12,000 payable to LaRoque.

146. On October 8, 2010, a USDA representative sent the following email to LaRoque:

> The advance of $37,500 for the balance of . . . [IRP Loan Nine] will be in a paper check dated 10/12/10. Apparently an ACH/EFT was not set up for your company. I have attached the ACH form that you will need to take to your bank for completion. Please fax back to me today as soon as possible so I can set the EFT up in Finance and order the $62,500 from [IRP Loan Ten]. These two amounts will total the $100,000 that you request and . . . [USDA field representative] reviewed and agreed to." The $37,500 check will automatically come to our office, I will forward it on to you.

147. On October 14, 2010, the $62,500 drawn on IRP Loan Ten was electronically transmitted from the United States Department of Treasury, to ECDC's bank account at RBC Bank in Kinston, North Carolina. By letter dated October 22, 2010, a check in the amount of $37,500, in payment of the final draw on IRP Loan Nine, was mailed from the USDA's office in Raleigh, North Carolina, to LaRoque's home address and ultimately deposited into ECDC's bank account on October 25, 2010. Because these funds were not needed to fund the $100,000 loan to the Snow Hill attorney, they were simply added to ECDC's stockpile of cash.[27]

---

[27]Under the purported management contract executed by LaRoque and LaRoque's wife on January 22, 2009, LaRoque would have been entitled to additional $3,000 per year due to the $100,000 increase in ECDC's stockpile of cash.

Case 4:12-cr-00088-H   Document 32   Filed 04/17/13   Page 58 of 77

148. In the fall of 2010, LaRoque ran for the North Carolina House seat for North Carolina District 10. During the months leading up to the election, LaRoque's opponent circulated campaign fliers which questioned some of the practices engaged in by LaRoque in operating ECDC and PDC. LaRoque's opponent also alleged that LaRoque financed LMG with federally-funded loans. In response to these allegations, LaRoque filed a defamation lawsuit against his opponent ("Defamation Lawsuit"). The Snow Hill attorney represented LaRoque in the Defamation Lawsuit.

149. On November 2, 2010, LaRoque was elected as state representative for North Carolina District 10. LaRoque's Defamation Lawsuit against his opponent continued following the election.

150. During ECDC's 2009-2010 fiscal year, it paid LaRoque $291,225 in compensation ($105,000 to LaRoque and $186,225[28] in checks payable to LMG) and $16,478.67 in reimbursement expenses (all of which were paid to LMG) during this period. ECDC made loans to less than ten borrowers[29] during this period (including LMG and the Snow Hill attorney).

151. ECDC's Form 990 for the 2009-2010 tax year, was executed by LaRoque under penalties of perjury. In the Form 990, LaRoque

---

[28]This amount includes the three $50,000 payment made to LMG in 2010 which were purported to be loans.

[29]Although the ECDC Board approved or confirmed loans to six borrowers, it appears that ECDC made loans to at least two additional borrowers.

59

represented that he worked 45 hours per week in fulfilling his position at ECDC and received $105,000 in compensation from ECDC. This is the total amount of ECDC compensation checks made payable to LaRoque, but includes neither the $36,225 in ECDC compensation checks paid to LMG, nor the $150,000 of additional ECDC checks paid to LMG as purported loans. In response to questions inquiring as to whether the non-profit had any outstanding loans to officers and directors, or persons relating to them, ECDC answered "no."

152. The Form 990 filed by PDC for the 2009-2010 tax year, which was executed by LaRoque under penalties of perjury, represents that LaRoque worked 20 hours per week in fulfilling his duties as President of PDC. In response to the portions of the Form 990 regarding compensation owed by PDC to LaRoque, PDC lists no compensation owed.

153. In October through December of 2010, ECDC paid LaRoque three compensation checks totaling $34,000.

154. On December 16, 2010, ECDC held a Board meeting during which a new board member was added. This was the first ECDC Board meeting having a director other than LaRoque, LaRoque's wife, and LaRoque's brother, since April of 2009. At the meeting, the Board approved the 2010-2011 budget, which proposed a payment of $145,000 to LaRoque.

155. According to the minutes, LaRoque then reviewed a subpoena recently received by ECDC for documents relating to

60

LaRoque's Defamation Suit and recommended that, due to a concern over borrower confidentiality, ECDC challenge the subpoena. The Board unanimously voted to challenge the subpoena. LaRoque hired the Snow Hill attorney to represent ECDC. ECDC would ultimately pay the Snow Hill attorney $58,046.75,[30] in connection with the challenge to the subpoena. The Snow Hill attorney also received $12,000 in payments from the LaRoque Campaign Committee in connection with the Defamation Lawsuit, but no payments directly from LaRoque.

156. After concluding the ECDC Board meeting, LaRoque called a meeting of the PDC Board, its first meeting since June of 2009, and added the new ECDC director as a member of the PDC Board. This was the first PDC Board meeting having a director other than LaRoque, LaRoque's Wife, and LaRoque's brother, since February of 2007. The PDC Board, for the first time in its existence, was shown a budget proposing payment for "contracted services." The amount proposed was $24,000 per year.

157. On January 12, 2011, the Snow Hill attorney received another ECDC loan in the sum of $30,000.

158. On February 25, 2011, ECDC paid the Snow Hill attorney $12,426.50 in attorney fees relating to LaRoque's Defamation Lawsuit. The billing statement pertaining to these fees includes

---

[30]Included in this amount is a fine of $17,250 for ECDC's refusal to comply with Court Order compelling ECDC to comply with the document subpoena in the Defamation Case.

legal work relating to subpoenas that had been served on LMG in the LaRoque's Defamation Suit.

159. On April 14, 2011, LaRoque filed his 2011 Statement of Economic Interest with the North Carolina State Ethics Commission, covering the 2010 calendar year. In response to the question requiring the disclosure of any sources of income of over $5,000 in 2010, LaRoque listed the following three sources of income: (a) LaRoque Management Group; (b) Stephen LaRoque Consulting; and (c) Rentals. Despite his failure to list ECDC in his disclosure form, during the 2010 calendar year ECDC paid $105,000 directly to LaRoque and $220,225 in checks payable to LMG.

160. On April 26, 2011, the Snow Hill attorney received another ECDC loan in the sum of $21,000.

161. On May 25, 2011, ECDC paid the Snow Hill attorney $8,925.50 in attorney fees relating to LaRoque's Defamation Lawsuit.

162. On or about June 18, 2011, less than a month before his wedding anniversary, LaRoque made an $8,100 charge on his Visa credit card to purchase the following items of jewelry at Diamonds Direct Crabtree in Raleigh: (I) a "3.21 Yellow Sapphire & . . . Diamond Ring"; (ii) a "1.34 Black & White Diamond Ring; and (iii) a "16" Gold Chain."

163. On July 11, 2011, an accountant completed ECDC's audit for the fiscal year of October 1, 2008, through September 30, 2009.

62

In the audit, the $150,000 payment to LMG, which LaRoque had informed the auditor was a short term loan that he would pay back upon receiving an inheritance, is not listed in the accounts receivable category. Had it been listed in that category, the audit would have included the fact that it was a zero percent interest loan.[31] Instead, the $150,000 purportedly owed by LMG to ECDC is listed in a separate category labeled "Other." In addition, there is no entry for deferred compensation owed to LaRoque which was purportedly serving as collateral for the purported $150,000 loan. Finally, the "Combined Statement of Activities" breakdown does not include the $150,000 payment in the "contracted services" entry.

164. By June of 2011, an Internet Publication ("Internet Publication") began making inquiries about the manner in which LaRoque operated ECDC and PDC and submitted an e-mail to LaRoque containing a number of questions, including the following question regarding LaRoque's salary from the non-profits:

> How is your salary determined? Who approves it? And, at what stage does your board of directors have input? Do you see that pay as coming from public funds?

165. On July 14, 2011, the Snow Hill Attorney's firm made a "FOIA request to IRS for . . ." records pertaining to a tax exempt

---

[31]As noted above, ECDC had never reported a zero percent loan in its audited financial statement.

Case 4:12-cr-00088-H   Document 32   Filed 04/17/13   Page 63 of 77

status of the Internet Publication. The fees related to this legal work were paid by ECDC.

166. On August 1, 2011, LaRoque and his wife executed an ECDC check payable to LaRoque in the sum of $25,000.

167. On August 3, 2011, after LaRoque refused to respond to the Internet Publication's written questions, the Internet Publication published an Internet article which was critical of LaRoque's operation of ECDC and PDC. In the article, the former ECDC Co-Signatory Director is quoted as stating that one reason he left ECDC's board was because LaRoque was making loans prior to coming to the Board for approval. LaRoque responded to the negative article by making a brief statement to a local newspaper and announcing his intent to have a press conference on August 16, 2011, to respond to article.

168. On August 12, 2011, LaRoque made a $10,484.11 e-payment from his personal bank account in payment of the balance owed on his Chase Credit Card, including the charges made at Diamond Direct.

169. On August 15, 2011, LaRoque called an ECDC Board Meeting which was attended by LaRoque, LaRoque's wife, LaRoque's brother and three new board members. Each of the new Board members were longtime friends and political supporters of LaRoque. One of the new board members ("Kinston CPA") had received payments over the years for various accounting and/or tax preparation services

64

peformed for LaRoque, LaRoque's wife, Susan's Carpet, LMG, and ECDC. The second new director was a political supporter of LaRoque. The final new director has a daughter that works for LaRoque as a legislative assistant. The board member that had been appointed at December 16, 2010, board meeting was not present at this meeting.

170. After appointing the new board members, LaRoque requested the newly constituted Board to reaffirm the agreement that LaRoque and LaRoque's wife had executed on January 22, 2009. After LaRoque explained the parameters of the contract, the minutes indicate that LaRoque, LaRoque's wife, and LaRoque's brother recused themselves from the vote of whether to reaffirm the contract. The three new Board members then unanimously reaffirmed the 2009 contract. The minutes do not reflect any discussion about the $300,000 in purported loans that were owed to ECDC by LMG.

171. LaRoque next addressed the status of the loan made to a partnership in which the former ECDC Co-Signatory Director holds an interest. The Board voted to foreclose on the loan. Finally, the Board reviewed a powerpoint presentation for use in a press conference that LaRoque had scheduled for the next day.

172. After the ECDC Board meeting, LaRoque called a meeting of the PDC Board adding the same new members as he had added to the ECDC Board. The new PDC Board unanimously affirmed LaRoque's

January 22, 2009, management contract, with LaRoque, LaRoque's wife, and LaRoque's brother rescuing themselves from the vote.

173. On the next day, August 16, 2011, LaRoque held a press conference during which he made a powerpoint presentation. During the presentation, LaRoque stated that "Board members approve all loans [made by ECDC and PDC] and approved the [his] contract for services." LaRoque then displayed a portion of the February 16, 1999, Board minutes stating that LaRoque's contract is approved and the Board will conduct yearly evaluations. LaRoque did not disclose that the contract referred to in the February 1999 minutes paid him $18,000 per year or that ECDC's Board minutes do not reflect a yearly evaluation of LaRoque ever being conducted by the Board. LaRoque also failed to disclose that his contract from January 2009 was made effective retroactively more than a decade and significantly increased his income during such period. LaRoque, notwithstanding his previously professed concern over customer confidentiality, openly discussed the former ECDC Co-Signatory Director's delinquent loan with ECDC. Finally, LaRoque challenged any criticisms regarding the loans that ECDC had made to the Snow Hill attorney. The press conference was attended by the three new directors that had been added to the ECDC Board the previous day.

174. On the same day as the press conference, LaRoque signed an ECDC check, in the sum of $5,968.50, in payment of legal fees

owed to the Snow Hill Attorney in connection with LaRoque's Defamation Lawsuit.

175. On September 7-8, 2011, Federal Grand Jury subpoenas were served on LaRoque, ECDC, PDC, LMG, and the LaRoque Campaign Committee.

176. Within days of the service of the Grand Jury subpoenas, LaRoque began raising money for use in attempting to have LMG pay back some of the purported loans from ECDC. On September 12, 2011, LaRoque wrote a $50,000 to LMG. On this same date, a $50,000 payment was made from LMG to ECDC, with the words "Loan Repayment" written in the memo line of the check.

177. On September 21, 2011, LaRoque requested an investment company to cash out certain bonds that he had inherited from his parents. On September 28, 2011, LaRoque made the following two deposits into his personal checking account at SECU: (a) a $45,000 transfer from a SECU money market account; and (b) a $107,489.96 check from bonds sold from his personal investment account at an investment company named Pershing. On this same day, LaRoque deposited a $150,000 check from his personal account into LMG's bank account and then executed an LMG check, in the sum of $150,000, payable to ECDC, with the LMG check referencing "Loan Repayment."

178. On September 28, 2011, LaRoque, on behalf of ECDC, marked the $200,000 promissory note from LMG to ECDC as paid in full.

179. On September 30, 2011, both ECDC and PDC had Board meetings during which LaRoque purposed the adoption of conflict of interest policies. Included in the purpose of each proposed policy is the following general understanding: "there exists between [PDC/ECDC] and its board, officers and management employees and the public a fiduciary duty which carries with it a broad and unbending duty of loyalty and fidelity."

180. On October 5, 2011, LaRoque reached an agreement regarding the legal fees due in connection with the Defamation Lawsuit under which the Snow Hill attorney agreed that if ECDC immediately paid its bill, the Snow Hill attorney would provide LaRoque with additional time to pay the remainder of the bill. On October 7, 2011, ECDC paid the Snow Hill attorney $13,476.25 in attorney fees relating to LaRoque's Defamation Lawsuit. On this same date, LaRoque and the Kinston CPA executed an ECDC check, in the sum of $139,170.42, payable to LMG.

181. On or about October 7, 2011, LaRoque amended his previously filed 2009 Federal Income Tax Return and LMG's previously filed 2009 Federal Tax Return. The Kinston CPA assisted in the preparation of the amended returns.

182. On or about October 12, 2011, LaRoque amended ECDC's Form 990s for the 2008-09 and 2009-10 tax years to remove, among other things, disclosures that he was a compensated director/contractor. LaRoque then added a new disclosure that LMG was a contractor of

68

ECDC during such time. On this same date, LaRoque amended PDC's Form 990s for the 2008-09 and 2009-10 tax years to remove, among other things, reference to LaRoque as a paid contractor of PDC's affiliate, ECDC.

183. On October 31, 2011, LaRoque and the Kinston CPA executed an ECDC check, in the sum of $10,298.18, payable to LMG.

184. On November 4, 2011, ECDC paid the contempt fine imposed against it in connection with the Defamation Lawsuit by a check in the sum of $17,250 made payable to the Snow Hill attorney. The Snow Hill attorney then used this payment to satisfy the contempt fine against ECDC.

185. On or about November 9, 2011, LaRoque and LaRoque's wife filed their 2010 Federal Joint Income Tax Return which significantly understated their tax liability for 2010. The Kinston CPA assisted in the preparation of this return.

186. On December 9, 2011, LaRoque and LaRoque's brother executed an ECDC check in the sum of $20,000 payable to LMG.

187. On January 10, 2012, LaRoque and the Kinston CPA executed two checks payable to LMG in the amounts of $60,550.61 and $18,642.47.

188. On or about January 27, 2012, LaRoque, LaRoque's wife, and LaRoque's brother resigned from ECDC and PDC's Boards. LaRoque then changed his contractual relationship from an independent contractor to an ECDC employee.

189.   On February 29, 2012, the ECDC Board was presented with a financial summary which listed ECDC's current loan portfolio as $1,033,595.24, on February 29, 2012.   This amount was less then half of the $2,261,824.13 loan portfolio listed by ECDC on August 31, 2011.

190. From March 16, 2012, through May 11, 2012, LaRoque and the Kinston CPA executed ECDC compensation checks payable to LaRoque in the sum $32,275.30.

191. The allegations set forth in the foregoing Introduction are hereby incorporated by reference into each count of this Second Superseding Indictment and realleged therein.

<u>COUNTS ONE through FOUR</u>

[Theft Concerning Programs Receiving Federal Funds;
18 U.S.C. §§ 666(a)(1)(A) and 2]

From in or about January of 2009, through mid-2012, within the Eastern District of North Carolina and elsewhere, the Defendant, STEPHEN A. LaROQUE, aiding and abetting others, being an agent of an organization, hereinafter listed, which received, during the periods described below, benefits in excess of $10,000 under Federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of Federal assistance, from the United States Department of Agriculture, Rural Development, did embezzle, steal, obtain by fraud, intentionally misapply, and otherwise without authority knowingly convert to the use of any person other than the rightful owner, property described below valued at $5,000

70

or more that was owned by and under the care, custody, and control of such organization, in violation of Title 18, United States Code, Section 666(a)(1)(A). The allegations made in this paragraph are repeated and re-alleged in each of the following COUNTS ONE through FOUR of this Second Superseding Indictment, as though fully set forth therein:

| Count | Organization | Property | Federal Program Benefits |
|-------|--------------|----------|--------------------------|
| 1 | ECDC | ECDC check number 2634, dated June 26, 2009, written on ECDC's bank account at RBC Centura Bank and made payable to "LaRoque Management Group" in the amount of $150,000 | ECDC received within one year of June 26, 2009, benefits in excess of $10,000, in the form of IRP loan disbursements from the USDA's Rural Development |
| 2 | ECDC | ECDC check number 2681, dated January 29, 2010, written on ECDC's bank account at RBC Centura Bank and made payable to "LaRoque Management Group" in the amount of $50,000 | ECDC received within one year of January 29, 2010, benefits in excess of $10,000, in the form of IRP loan disbursements from the USDA's Rural Development |
| 3 | ECDC | ECDC check number 2691, dated March 5, 2010, written on ECDC's bank account at RBC Centura Bank and made payable to "LMG" in the amount of $50,000 | ECDC received within one year of March 5, 2010, benefits in excess of $10,000, in the form of IRP loan disbursements from the USDA's Rural Development |

| 4 | ECDC | ECDC check number 2702, dated May 7, 2010, written on ECDC's bank account at RBC Centura Bank and made payable to "LMG" in the amount of $50,000 | ECDC received within one year of May 7, 2010, benefits in excess of $10,000, in the form of IRP loan disbursements from the USDA's Rural Development |

Each entry in the above table constituting a separate violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

## COUNTS FIVE through EIGHT

### [Monetary transactions in criminally derived property; 18 U.S.C. §§ 1957 and 2]

On or about the dates hereinafter set forth, within the Eastern District of North Carolina and elsewhere, Defendant, STEPHEN A. LaROQUE, aiding and abetting others, did knowingly engage, and attempt to engage, in monetary transactions, as that term is defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property, as that term is defined in Title 18, United States Code, Section 1957(f)(2), of a value greater than $10,000 and which was derived from specified unlawful activity, namely, violations of Title 18, United State Code, Section 666(a)(1)(A). The allegations made in this paragraph are repeated and re-alleged in each of the following COUNTS FIVE through EIGHT of this Second Superseding Indictment, as though fully set forth therein:

72

| Count | On or About | Financial transaction |
|-------|-------------|------------------------|
| 5 | 6/26/2009 | $141,500 check from LaRoque Management Group made payable to Bladez on Ice and used to purchase an Official Bank check in the sum of $141,500 for use in funding Stephen A. LaRoque's purchasing an ownership interest in Bladez on Ice |
| 6 | 2/4/2010 | $66,000 check from LaRoque Management Group to the holder of a promissory note executed by Susan's Carpet in connection with the purchase of Bladez on Ice |
| 7 | 3/5/2010 | $89,482.22 check from LaRoque Management Group to the Snow Hill Attorney to pay for the purchase of a rental house by LaRoque and LaRoque's Wife |
| 8 | 5/7/2010 | $20,000 check from LaRoque Management Group to L.S.K. Enterprise, Inc., in partial payment of an ice re-surfacer for Bladez on Ice |

Each entry in the above table constituting a separate violation of Title 18, United States Code, Section 1957.

## COUNT NINE

### [Falsify, Conceal, and Cover Up by Scheme and Device; 18 U.S.C. §§ 1001(a)(1) and 2]

From in or about January of 2009, through in or about August 2011, within the Eastern District of North Carolina and elsewhere, the Defendant, STEPHEN A. LaROQUE, in a matter within the jurisdiction of the United States Department of Agriculture, a department in the executive branch of the Government of the United States, did knowingly and willfully falsify, conceal, and cover up, by trick, scheme, and device material facts, as to which LaROQUE

73

had a duty to disclose, specifically, LaROQUE's creation and execution of new compensation agreements with ECDC and PDC on or about January 22, 2009, ECDC's and PDC's purported loans to a business in which LaROQUE held an ownership interest, and the withdrawal of the following amounts from ECDC's checking account for the personal benefit of Stephen A. LaRoque: $150,000 (by check dated June 26, 2009), $50,000 (by check dated January 29, 2010), $50,000 (by check dated March 5, 2010), and $50,000 (by check dated May 7, 2010), and did aid, abet, and cause said offense, in violation of Title 18, United States Code, Sections 1001(a)(1) and 2.

## COUNT TEN

### [Materially False, Fictitious and Fraudulent Representation; 18 U.S.C. §§ 1001(a)(2) and 2]

On and about October 28, 2009, in the Eastern District of North Carolina and elsewhere, the Defendant, STEPHEN A. LaROQUE, in a matter within the jurisdiction of the United States Department of Agriculture, a department in the executive branch of the Government of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in that LaROQUE executed a document entitled "United States Department of Agriculture-Rural Development-Security Agreement" in which he warranted, covenanted, and agreed that "[s]tatements contained in the Debtor's [ECDC] loan application(s) are true and correct." when, in truth and fact, a statement in the loan application was

74

false, and did aid, abet, and cause said offense, in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT ELEVEN

### [Making and Subscribing a False Tax Return; 26 U.S.C. §§ 7206(1) and 2]

That on or about May 14, 2010, in the Eastern District of North Carolina and elsewhere, Defendant, STEPHEN A. LaROQUE, a resident of Kinston, North Carolina, did willfully make and subscribe, and did willfully aid, abet, assist, and cause to be so made and subscribed, a joint United States Income Tax Return for the calendar year 2009, which was verified by a written declaration that it was made under the penalties of perjury and which LaROQUE did not believe to be true and correct as to every material matter, in that the income tax return, which was filed with the Internal Revenue Service, understated the amount of tax liability owed by LaROQUE and his wife for the 2009 calendar year.

All in violation of Title 26, United States Code, Sections 7206(1) and 2.

## COUNT TWELVE

### [Making and Subscribing a False Tax Return; 26 U.S.C. §§ 7206(1) and 2]

That on or about October 31, 2011, in the Eastern District of North Carolina and elsewhere, Defendant, STEPHEN A. LaROQUE, a resident of Kinston, North Carolina, did willfully make and subscribe, and did willfully aid, abet, assist, and cause to be so

made and subscribed, a joint United States Income Tax Return for the calendar year 2010, which was verified by a written declaration that it was made under the penalties of perjury and which the LaROQUE did not believe to be true and correct as to every material matter, in that the income tax return, which was filed with the Internal Revenue Service, understated the amount of tax liability owed by LaROQUE and his wife for the 2010 calendar year.

All in violation of Title 26, United States Code, Sections 7206(1) and 2.

## FORFEITURE NOTICE

Defendant, STEPHEN A. LaROQUE, is hereby given notice of the provisions of Title 18, United States Code, Section 981 (a)(1)(C), as made applicable herein by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(a)(7), that all his interest in all property specified herein is subject to forfeiture. As a result of the foregoing offenses of the Second Superseding Indictment, LaRoque shall forfeit to the United States any and all property constituting, or derived from, any proceeds the said Defendant obtained directly or indirectly as a result of the said offense.

If any of the above described forfeitable property, as a result of any act or omission of LaRoque,

> (1)  cannot be located upon the exercise of
> due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of LaRoque up to the value of the above forfeitable property.

A TRUE BILL

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

_17 Apr 2013_
Date

THOMAS G. WALKER
United States Attorney

BY: DENNIS M. DUFFY
Assistant United States Attorney
Criminal Division

77